UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

ERIC L WALKER,
     Plaintiff,

vs.                          Case No.: 3:21cv888/LAC/ZCB

SGT RYAN DAY, et al.,
     Defendants.
_____/

## **REPORT AND RECOMMENDATION**

This is a prisoner civil rights case filed under 42 U.S.C. § 1983. Plaintiff Eric Walker is an inmate of the Florida Department of Corrections (FDOC). Defendants are five corrections officers employed by the FDOC. Plaintiff claims Defendants violated the Eighth Amendment by using excessive force and being deliberately indifferent to his medical needs. (Doc. 24 at 16). Defendants have filed a combined motion to dismiss for failure to exhaust and motion for summary judgment. (Doc. 56). Plaintiff has responded in opposition. (Docs. 62,

1

63).[1]  For the reasons below, Defendants' motion should be granted in part and denied in part.

## I.    Factual Background

### A. Plaintiff's version of events regarding the excessive force claim

Plaintiff alleges that on Wednesday, August 19, 2020, at approximately 11:30 a.m., Plaintiff was "accused of committing a 6-1 rule infraction" and threatened with confinement by Defendant Robinson. (Doc. 24 at 5).  Plaintiff re-entered the dormitory, eventually followed by "several other officers," including Defendants Robinson and Danio, who initiated a lockdown in the dormitory.  (*Id.*).  Plaintiff alleges he began to "argue[]" with Defendant Robinson about the confinement threat.  (*Id.* at 5-6).  Realizing that Defendant Robinson "was not being aggressive toward him," Plaintiff began to calm down and back away.  (*Id.*).

Plaintiff claims he then turned to another officer "to allow himself to be cuffed up," but Defendant Danio "escalate[d]" the situation by

---

[1] Although filed by Plaintiff, these documents were incorrectly titled (and, therefore, docketed) as though filed by Defendants.

"immediately . . . rais[ing] a can of pepper spray and spray[ing Plaintiff] right between the eyes while saying to [Defendant] Robinson, 'On two, let's get him!'" (*Id.* at 6).  Plaintiff claims he "immediately felt the hot, burning sensation of the mace beginning to blur his eyes" and noticed "from his blurred peripheral vision a large bodied, blurry figure moving hastily in his direction." (*Id.*).  Plaintiff says he feared an impending attack, so he tried to preemptively defend himself by taking a swing at Defendant Robinson.  (*Id.* at 6-7).  In response, Defendant Robinson placed Plaintiff's "right arm in an 'arm-lock.'" (*Id.*).

Plaintiff alleges he attempted to pull away from "this dangerous arm-lock," but Defendant Robinson prevented Plaintiff from doing so by applying pressure under Plaintiff's right arm.  (*Id.* at 7).  Plaintiff attempted to alleviate the pressure on his arm by standing up on his toes, but Plaintiff's "feet were pulled out from under him." (*Id.*).  And at that point, Plaintiff claims his right arm broke.  (*Id.*).  Plaintiff alleges he was then "beat[en]," beginning with Defendant Day kicking Plaintiff in the face.  (*Id.*).  Plaintiff says his shoe was "ripped off," and his left big toe bent "violently backward."  (*Id.*).  Plaintiff further claims he "was

punched violently in the lip, causing it to break skin," and his left middle finger was "violently bent backward in an attempt to break it." (*Id.* at 8).

Plaintiff alleges the officers were then "pushed off of him," and he was instructed to cuff up. (*Id.*). According to Plaintiff, he "immediately moved to comply," but he could not get his right arm to move due to the injury. (*Id.*). So, one of the guards physically "moved his right arm behind his back and double-cuffed it to his left" hand. (*Id.*). At this point, Plaintiff was still laying on the ground with his legs shackled. (*Id.*). Plaintiff alleges he was brought to his feet, and Defendant Day whispered "Your (sic) still a nig***, and I can kill you anytime I get ready." (*Id.*). In response, Plaintiff claims he "complied peacefully with all orders." (*Id.* at 9).

Once Plaintiff was escorted outside, he alleges Defendants Day and Cook began simultaneously yelling "Stop resisting! Stop resisting!," even though he was not resisting. (*Id.*). They then "slammed [Plaintiff] over hard onto his face on the concrete walkway and partial grassy area." (*Id.*). Plaintiff alleges that this takedown further injured his right arm. (*Id.*). Plaintiff was then taken to a decontamination shower, where he

4

noticed his right arm was "loosely hanging from his body." (*Id.* at 10). Plaintiff began yelling "y'all broke my f-ing arm!" (*Id.*).

After his decontamination shower, Plaintiff was ordered to cuff up. (*Id.*). Although his right arm was injured, Defendant Day forced Plaintiff to "cuff up from the back." (*Id.*). Plaintiff informed Defendant Day that he could not because his arm was broken. (*Id.* at 11). According to Plaintiff, Defendant Day then reached through the flap, grabbed Plaintiff's right arm, and "venomously snatched backwards up and out of the flap," which caused further injury to his injured arm. (*Id.*).

Plaintiff was then taken to medical for a post-use-of-force exam. (*Id.* at 12). Plaintiff alleges that Defendant Day prevented the nurse from fully examining his injuries. (*Id.*). Plaintiff was escorted to a "mental health/observation cell," where he was in extreme pain and denied any pain medication. (*Id.*). Plaintiff alleges his cumulative injuries included: "an almost broken left middle finger, left big toe, [and] lower right rib, a busted lip, and severe nerve damage to his right 'writing hand,' right wrist, and fingers" as well as "many more bumps, bruises, and abrasions." (*Id.*).

5

**B. Defendants' version of events regarding the excessive force claim.**

Defendants tell a different story about what happened during the incident in question. Although Defendants do not dispute that any of the claimed uses of force occurred, they deny that the force was excessive. According to Defendants, all force used was necessary and appropriate given Plaintiff's resistance and aggressive conduct. In support of their motion, Defendants submitted affidavits and video evidence.

Defendants claim that pepper spray was first used after Plaintiff failed to comply with commands and was acting aggressive. (Doc. 56 at 2). According to Defendants, Plaintiff then took a swing at an officer. That action led Defendants to use "force to subdue and restrain" Plaintiff. (*Id.*). With regard to the takedown outside the dormitory, Defendants say it was done because of Plaintiff's "refusal to follow lawful orders and walk to the decontamination shower." (*Id.* at 3). Defendants further assert that Plaintiff was then given a decontamination shower, evaluated by medical personnel, and taken to an observation cell. (*Id.*).

6

**C. The video evidence submitted by Defendants.**

In support of their motion for summary judgment, Defendants have submitted video evidence. That video evidence consists of fixed wing camera footage, fixed entryway camera footage, fixed outside camera footage, and handheld camera footage. The Court has reviewed the video footage and will summarize below what it shows.

### 1. Fixed Dormitory Camera Footage

The fixed dormitory camera footage shows three officers enter the camera's view (00:12) and approach Plaintiff as he is seated outside a cell. (00:18). It appears that Plaintiff speaks with one of the officers before Plaintiff stands up and paces. (00:32). Other inmates in the area retreat to their cells. (01:05). Plaintiff continues to pace back and forth in front of the three officers with his back to the wall. (1:46). Plaintiff stands behind the stairs and the officers fill in, cutting off Plaintiff's ability to walk in that direction. (2:12). Plaintiff periodically moves his hands back and forth in front of his body. (*Id.*). Plaintiff then stands still for a moment, and one of the officers lifts an arm in Plaintiff's direction. (2:17). Plaintiff immediately bends over. (*Id.*).

7

Plaintiff then lunges in the direction of the congregated officers and uses his hand to strike one of them in the head area. (2:19). The officers immediately respond to that aggressive act by grabbing Plaintiff and struggling with him before he is ultimately taken to the ground. (2:28). The struggle continues on the ground. (2:30). Other officers arrive and join the struggle. (2:41). One officer stands up and bends over, covering his eyes in apparent pain. (3:33). Officers then come in and out of the unit, while several officers continue to hold Plaintiff down. (4:14). Two officers eventually bring Plaintiff to his feet, secure him by holding his arms, and escort him out of the unit. (5:25).

### 2. *Fixed Entryway Camera Footage*

The fixed entryway camera shows a narrow view of an entryway with four officers standing/walking around. (0:02). Plaintiff is escorted through the view pane of the video from the left side, bent over in a "L" shape, while officers hold his arms. (1:37). It appears Plaintiff attempts to step backwards when he approaches the door leading outside, but the officers pull him forward and keep moving. (1:40). Several officers follow, and the entire group exits the view pane. (2:00).

8

### 3. Fixed Outside Camera Footage

The fixed outside camera footage shows two officers depart the wing, while holding Plaintiff on each side. (00:48). Plaintiff's hands are behind his back and raised up, such that he is in a bent-over "L" position. (*Id.*). Several other officers follow closely behind. (*Id.*). Plaintiff is then pulled off the walkway and taken down on the grass. (00:55). Several officers hold him down, while a few others stand nearby. (*Id.*). The standing officers eventually move closer to Plaintiff and the officers on the ground. (1:28). A few officers back up, and then the officers holding Plaintiff appear to release their grip on him. (1:47). Two officers assist Plaintiff to his feet and escort him back onto the walkway. (1:50). The officers next walk with Plaintiff towards the exit gate. (1:54).

### 4. Handheld camera footage

The handheld camera footage begins with the cameraperson proceeding to the grassy area where Plaintiff is being held down by several officers. (00:09). Other officers are standing up, surrounding the group on the grass. (*Id.*). Plaintiff then stands up, held by an officer on each arm, with his handcuffed hands raised up behind his back and his

ankles shackled. (1:03). Plaintiff is escorted outside of the gate, with the cameraperson walking behind Plaintiff and the other officers. (1:18).

One officer walking behind the cameraperson orders the escorting officers to stop walking while that officer pulls up Plaintiff's sagging pants. (3:09). The group continues walking into a building, at which point Plaintiff appears to slow down. (4:52). One of the escorting officers instructs Plaintiff not to resist. (*Id*.). Plaintiff is told he is almost there and to keep walking. (5:03). Plaintiff drops to his knees in front of the shower, and his ankle restraints are removed. (5:42). Plaintiff is assisted to his feet and into the shower. (6:11). The officers close the shower door (leaving Plaintiff alone in the shower) and then appear to remove his handcuffs. (6:56). Plaintiff then stands under the water facing the wall. (10:15).

Next, an officer approaches the shower cell door and handcuffs Plaintiff. (18:24). An additional officer walks up (18:58), but at this point, the audio is quite muffled—it is difficult to tell what the officers are instructing Plaintiff to do. (19:25). A loud yelp can be heard at 20:50, but it is not clear if the sound is coming from Plaintiff. One of the officers

10

can be heard saying, "You do what I tell you to do." (21:06). The officers then grab Plaintiff's arms and pull him out of the shower. (21:33).

Plaintiff then drops to his knees, and an officer shackles his ankles. (21:54). Plaintiff is escorted to his feet (22:16), and he is led to a medical exam room. (23:05). The exam room door is closed, and the cameraperson is filming through the door's windowpane. (23:30). The door is then cracked open when an officer leaves, and Plaintiff is seen sitting on a table with officers holding his arms. (26:42). The officer then re-enters the room, and two officers escort Plaintiff out of the room and turn him in a circle so the medical staff can see his body. (27:15). The officers then escort Plaintiff to a cell. (28:35). The officers remove Plaintiff's handcuffs through an opening in the cell door, and the video ends.

### D.    Plaintiff's allegations of deliberate indifference

In addition to excessive force, Plaintiff has alleged that Defendant Lowe was deliberately indifferent to his serious medical needs. Plaintiff claims that he passed out in the observation cell due to pain. (Doc. 24 at 13). When Plaintiff woke up, he says he declared a medical emergency

to Defendant Lowe. (*Id.*). Defendant Lowe allegedly replied, "that's what you get for what you did" and walked off. (*Id.*). Later, Plaintiff encountered Defendant Lowe while outside his cell, and Defendant Lowe "forced" Plaintiff back into the cell without calling medical. (*Id.* at 13-14). Plaintiff alleges he was then moved to another empty cell in a different wing and continually denied medical attention. (*Id.* at 14).

Plaintiff alleges that two days later, different officers arrived on the unit and they "immediately" took him to medical because his arm was swollen. (*Id.* at 14-15). According to Plaintiff, his arm was broken and placed in a cast. (*Id.* at 15). Additionally, Plaintiff says surgery was scheduled to repair his arm. (*Id.*).

Defendant Lowe does not dispute that he encountered Plaintiff in the observation cell. (Doc. 56 at 3). Defendant Lowe denies knowing that Plaintiff required medical treatment. According to Defendant Lowe, he believed Plaintiff had already been assessed by medical and any issues were treated. (*Id.* at 35).

## II.    Discussion

As previously mentioned, Defendants have filed a combined motion to dismiss and motion for summary judgment.  They argue dismissal is warranted because Plaintiff failed to exhaust his administrative remedies.[2]  And they argue summary judgment is warranted because there are no genuine issues of material fact.  The Court will discuss both arguments below, starting with exhaustion.

### A. Exhaustion under the Prison Litigation Reform Act

Under the Prison Litigation Reform Act (PLRA), "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  The PLRA's exhaustion requirement was enacted to "eliminate unwarranted federal-court interference with the administration of prisons" and "afford corrections

---

[2] The Eleventh Circuit has said that a lack of exhaustion argument "should be raised in a motion to dismiss, or be treated as such if raised in a motion for summary judgment."  *Bryant v. Rich*, 530 F.3d 1368, 1375 (11th Cir. 2008).

officials time and opportunity to address complaints internally before allowing the initiation of a federal case." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006) (cleaned up).

An inmate in FDOC custody exhausts administrative remedies by complying with the FDOC's grievance procedure. The FDOC's grievance procedure has three steps: (1) the inmate files an informal grievance within twenty days of the incident; (2) if the grievance is not resolved at that level, then the inmate files a formal grievance at the institutional level within fifteen days from the date the informal grievance was responded to; and (3) if the inmate is unhappy with the response at the institutional level, then the inmate files an appeal with the FDOC Central Office within fifteen days of the response to the formal grievance. Fla. Admin. Code Ann. r. 33-103.005-007, 011 (2018).

A defendant who moves to dismiss on exhaustion grounds bears the burden of showing the plaintiff's lack of exhaustion. *Varner v. Shepard*, 11 F.4th 1252, 1258 (11th Cir. 2021). The Eleventh Circuit has adopted a two-step framework for deciding whether to dismiss for lack of exhaustion. *Turner v. Burnside*, 541 F.3d 1077, 1082-83 (11th Cir. 2008).

14

At the first step, the Court must "look to the factual allegations in the motion to dismiss and those in the prisoner's response and accept the prisoner's view of the facts as true."  *Whatley v. Warden, Ware State Prison*, 802 F.3d 1205, 1209 (11th Cir. 2015).  If the facts as stated by the prisoner show a failure to exhaust, then the case should be dismissed at step one.  *Id.*  Where dismissal is not warranted on the prisoner's view of the facts, at step two, "the court makes specific findings to resolve disputes of fact, and should dismiss if, based on those findings, defendants have shown a failure to exhaust."  *Id.*

### 1. Exhaustion of excessive force claims

Here, it is undisputed that Plaintiff filed an informal grievance on August 25, 2020 regarding an alleged use of excessive force that occurred on August 19, 2020.  (Doc. 24-1)  It is also undisputed that this grievance was marked as "approved" and forwarded to the Office of the Inspector General for investigation.[3]  (*Id.*)  In this grievance, Plaintiff alleged that

_____

[3] Defendants have conceded that the informal grievance was approved and, therefore, Plaintiff fully exhausted as to the allegations contained in the grievance without going through the remaining steps in the

excessive force "left [him] with a bruised rib and a broken right arm." (*Id.*). The grievance further stated that Defendants Day and Cook lifted Plaintiff's arms up "far behind" his back "in order to face first [him] into the ground outside of C-dorm." (*Id.*). In the grievance, Plaintiff stated that he had already submitted to hand restraints and been sprayed with a chemical agent before this use of force occurred. (*Id.*).

With respect to the excessive force claims, Defendants argue that Plaintiff failed to exhaust administrative remedies as to (1) the claimed uses of force by Defendants Danio and Robinson, and (2) the claimed uses of force by Defendants Day and Cook that did not occur on the ground outside of C-dorm. (Doc. 56 at 7-8). Defendants Danio and Robinson further argue that they were not named in the approved informal grievance. And Defendants Day and Cook argue that Plaintiff has exhausted only with respect to actions taken outside of C-dorm, but he has not exhausted with respect to "[a]ny actions taken by [Defendants Day and Cook] in another place and at a different time." (*Id.* at 8-9).

---

grievance procedure. (Doc. 56 at 7). But Plaintiff and Defendant disagree regarding the scope of the conduct covered by that informal grievance.

16

Plaintiff disagrees and argues that the approved informal grievance was sufficient to exhaust his administrative remedies regarding his excessive force claims against Defendants Day, Cook, Danio, and Robinson. (Doc. 63 at 2).

Applying the *Turner* framework discussed above, the Court first finds that the "factual allegations in the defendant's motion to dismiss and those in the plaintiff's response" conflict. *See Turner*, 541 F.3d at 1082. And when the plaintiff's allegations are viewed as true, Defendants are not entitled to dismissal for lack of exhaustion. Thus, the Court cannot dismiss the case at step one and must proceed to step two of the *Turner* framework. *See id.* 1082-83. Step two requires the Court "to make specific findings in order to resolve the disputed factual issues." *See id.*

Here, at step two, the Court finds that Plaintiff sufficiently exhausted his administrative remedies as to Defendants Robinson and Danio, even though they were not specified by name in his approved informal grievance. As the Eleventh Circuit has explained, a "prisoner need not name any particular defendant in a grievance in order to

17

properly exhaust his claim." *Parzyck v. Prison Health Servs., Inc.*, 627 F.3d 1215, 1218 (11th Cir. 2010) (reversing dismissal for failure to exhaust based on prisoner's failure to name a defendant in his grievance papers); *see also Browning v. Cook*, No. 5:20-cv-299, 2022 WL 18144080, at *3 (N.D. Fla. Dec. 7, 2022) ("[T]he FD[O]C does not require inmates to identify a particular defendant in any grievance."). That is so because the "exhaustion requirement is designed to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued." *Parzyck*, 627 F.3d at 1219 (cleaned up). Thus, "a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought." *Harvard v. Inch*, 411 F. Supp. 3d 1220, 1244 (N.D. Fla. 2019) (cleaned up).

In this case, Plaintiff's approved informal grievance stated: "This is an informal grievance to address and file complaint about the excess force that was used on me Wens. Aug. 19, 2020, which left me with . . . a broken right arm." (Doc. 24-1 at 2). The grievance then discussed things that happened on that date both "inside" and "outside" of C-dorm. (*Id.*). The grievance mentioned that Plaintiff had been "maced, handcuffed,

18

shackled, and beaten down." (*Id*.).  The grievance specifically stated that Defendants Day and Cook "lifted [Plaintiff's] arms up and far behind my back in order to face first me into the ground outside of C-Dorm." (*Id*).

The information contained in the approved informal grievance was sufficient "to alert[] the prison to the nature of the wrong for which redress is sought." *See Harvard*, 411 F. Supp. 3d at 1244.  The grievance described the date of the incident, the locations where it occurred, and the nature of the excessive forced used.  Although Plaintiff's grievance named some but not all of the officers who were allegedly involved in the excessive force incident, that does not render his claim unexhausted. *See Jones v. Bock*, 549 U.S. 199, 218 (2007) (finding no support for the "conclusion that the grievance process was improperly invoked simply because an individual later named as a defendant was not named at the first step of the grievance process"); *see also Toenniges v. Ga. Dep't of Corr.*, 600 F. App'x 645, 649 (11th Cir. 2015) ("Exhaustion of the grievance procedure does not require that every single defendant be identified by name.").  The Court, therefore, rejects the argument that

Plaintiff's excessive force claims against Defendants Danio and Robinson have not been properly exhausted.

There is also no merit to the argument that Plaintiff failed to exhaust any claims against Defendants Day and Cook for conduct that occurred in locations other than outside C-dormitory. (*See* Doc. 56 at 9). Plaintiff's grievance references conduct that occurred both "inside" and "outside" of C-dormitory. (Doc. 24-1 at 2). Thus, the grievance can be fairly read as covering conduct by Defendants Day and Cook that occurred both inside and outside of the dormitory. For example, the grievance states: "After being handcuffed *inside* C-dorm Sgt. R. Day and Ofc. G. Cook lifted my arms up far behind my back in order to face first me in to the ground *outside* of C-dorm." (*Id*.) (emphasis added). Because the grievance included enough information to "alert prison officials to a problem," *see Parzyck*, 627 F.3d at 1219, the exhaustion requirement has been met with respect to the excessive force claims against Defendants Day and Cook.

    *2. Exhaustion of deliberate indifference claim against Defendant Lowe*

The result is different, however, with respect to Defendant Lowe's argument that Plaintiff failed to exhaust his deliberate indifference claim against him.[4]  (Doc. 56 at 9).  Because Defendant Lowe's contention that Plaintiff did not exhaust administrative remedies generally conflicts with Plaintiff's allegation that he properly exhausted his administrative remedies, the Court cannot resolve this issue at *Turner* step one, and it must proceed to step two.  *See Turner*, 541 F.3d at 1082-83.

At step two, the Court finds that Plaintiff's informal grievance was insufficient to exhaust his deliberate indifference to serious medical needs claim against Defendant Lowe.[5]  *See Shaffer v. Maddox*, No. CV

---

[4] Plaintiff's response addresses exhaustion generally and does not specifically make any argument regarding the exhaustion of the deliberate indifference claim against Defendant Lowe.

[5] It appears Plaintiff mentioned being "treated with indifference to [his] pain" in a formal grievance (Doc. 24-1 at 7).  It is clear, however, that this issue was not raised in the informal grievance Plaintiff originally filed (Doc. 24-1 at 2), which was approved by the FDOC.  Nor was it ever addressed by the FDOC because he inserted it in a formal grievance from an informal grievance (on an excessive force claim) that had been approved.  Because there was nothing to formally grieve given the approval of the informal grievance, the FDOC returned the formal grievance without action.  To the extent that Plaintiff's formal grievance could be read as raising a deliberate indifference complaint aimed at Defendant Lowe that was not raised in the informal grievance, such a

21

314-070, 2015 WL 1401629, at *4 (S.D. Ga. March 26, 2015) (determining the inmate did not exhaust his deliberate indifference claim when his approved grievance did "not mention or complain about the alleged denial of medical treatment after the use of force"); *see also Wilson v. Holland*, No. 4:17cv231, WL 2018 7019056, at *4 (N.D. Fla. Dec. 18, 2018) (holding the inmate did not exhaust administrative remedies with respect to his failure to protect claim because "[f]or [the p]laintiff to now bring a claim for failing to protect him, he had to grieve the fact that [the d]efendants did not protect him. He did not.").

Plaintiff's approved informal grievance regarding excessive force "inside" and "outside" of C-dormitory was insufficient to alert the FDOC to a deliberate indifference to serious medical needs issue involving the conduct of Defendant Lowe. Put another way, Plaintiff's informal grievance "does not raise the issues of medical treatment or deliberate indifference to serious medical conditions, and thereby did not alert officials to these claims." *See Pearson v. Taylor*, No. 7:13cv26, 2014 WL

---

complaint was not properly exhausted under the FDOC's grievance procedure.

2465535, at *3 (M.D. Ga. May 30, 2014) (dismissing a deliberate indifference claim for lack of exhaustion when the plaintiff did not "challenge any denial of medical care" in his grievance that alleged excessive force in pepper spraying the plaintiff). Defendant Lowe has shown that Plaintiff failed to exhaust his deliberate indifference to serious medical needs claim. So, this claim against Defendant Lowe should be dismissed for failure to exhaust.

## B. Defendants' summary judgment arguments

In addition to arguing that dismissal is warranted for failure to exhaust, Defendants seek summary judgment on the basis that there are no genuine issues of material fact. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Id*. at 248.

At bottom, the summary judgment question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id*. at 251-52. When answering that question, courts view the evidence in the light most favorable to the nonmoving party. *Scott v. Harris*, 550 U.S. 372, 380 (2007). But the nonmoving party bears the burden of coming forward with sufficient evidence on each element. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A mere "scintilla" of evidence is insufficient to meet that burden. *Young v. City of Palm Bay, Fla.*, 358 F.3d 859, 860 (11th Cir. 2004). Likewise, speculation or conjecture cannot create a genuine issue of material fact. *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).

When the plaintiff's version of events is "blatantly contradicted" by the record, a court "should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott*, 550 U.S. at 380. Thus, when a video recording of an incident clearly contradicts the plaintiff's version of events, the court views the evidence in the light depicted by the video. *Id*. at 380-81. To determine what facts are

24

"material" at the summary judgment stage, courts look to the substantive law. *Anderson*, 477 U.S. at 248. Completing that task here requires an examination of the law governing Eighth Amendment claims of excessive force.[6]

The "core judicial inquiry" in considering an excessive force claim is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992); *see also Whitley v. Albers*, 475 U.S. 312, 319-21 (1986). "When prison officials maliciously and sadistically use force to cause harm," the Court recognized, "contemporary standards of decency always are violated . . . . whether or not significant injury is evident." *Hudson*, 503 U.S. at 9.

"[T]he extent of injury suffered by an inmate is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation." *Id.* at 7 (cleaned up). The extent of

---

[6] Because Plaintiff's deliberate indifference to serious medical needs claim against Defendant Lowe should be dismissed for failure to exhaust, the Court will not discuss the merits of that claim for summary judgment purposes.

injury may also provide some indication of the amount of force applied. *See Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). As the Court stated in *Hudson*, not "every malevolent touch by a prison guard gives rise to a federal cause of action." 503 U.S. at 9. An inmate who has brought an excessive force claim "may avoid summary judgment only if the evidence viewed in the light most favorable to him goes beyond a mere dispute over the reasonableness of the force used and will support a reliable inference of wantonness in the infliction of pain." *Ledlow v. Givens*, 500 F. App'x 910, 913 (11th Cir. 2012) (internal quotations omitted).

### 1. *Plaintiff's claim based on the use of chemical agent spray*

Plaintiff claims Defendant Danio violated the Eighth Amendment by spraying a chemical agent at Plaintiff when he was complying with orders. When viewing the evidence in a light most favorable to Plaintiff, as the Court must at this stage, there is a genuine issue of material fact regarding this claim.

First, there is a genuine issue regarding whether Plaintiff was refusing orders to cuff up immediately before Defendant Danio sprayed the chemical agent. Plaintiff says he "turned around . . . and was about

to allow himself to be cuffed up" when Defendant Danio, "seeing that [Plaintiff] was about to be cuffed up" and that the situation was "de-escalating," immediately sprayed chemical agent "right between [Plaintiff's] eyes." (Doc. 24 at 6). Alternatively, Defendant Danio contends Plaintiff was "disobeying orders and causing a disturbance" at the time he administered the chemical agent. (Doc. 56 at 12). And the video footage (which has no audio) does not clearly resolve the dispute as to whether Plaintiff was or was not complying with orders when sprayed with the chemical agent.

The video shows that Plaintiff was pacing back and forth, but then he appears to be standing still right before the chemical agent is sprayed. If Plaintiff was resisting the officers' commands, then a single burst of pepper spray would not constitute excessive force. *See Thomas v. Bryant*, 614 F.3d 1288, 1311 (11th Cir. 2010) ("[W]here chemical agents are used unnecessarily, without penological justification, or for the very purpose of punishment or harm, that use satisfies the Eighth Amendment's objective harm requirement."); *see also Williams v. Rickman*, 759 F. App'x 849, 851 (11th Cir. 2019) (explaining that "officers in a prison

setting can use pepper spray on an inmate, but there must be a valid penological reason for such a use of force"). If Plaintiff's version of events is correct, however, and he was complying with commands, then a reasonable jury could find that Defendant Danio used the chemical agent spray without sufficient penological justification. *See Ruth v. Thomas*, CV322-013, 2023 WL 3743617, at *5 (S.D. Ga. May 4, 2023) (denying summary judgment where there was a dispute in the record as to whether the inmate was resisting commands prior to being sprayed with a chemical agent); *see also Reese v. Herbert*, 527 F.3d 1253, 1273 (11th Cir. 2008) (finding officers were not entitled to summary judgment on the plaintiff's claim that they sprayed him in the face with a chemical agent when he was not resisting). From the evidence before the Court, it is not possible to determine—without making a forbidden credibility determination—whether Plaintiff was or was not resisting when Defendant Danio used the chemical agent spray. *See Bowden v. Stokely*, 576 F. App'x 951, 954 (11th Cir. 2014) (affirming denial of summary judgment on excessive force claim where the prisoner's version of events and the officers' version of events differed regarding whether the prisoner

28

was resisting prior to force being used); *see also Simmons v. Williams*, No. 6:14-cv-111, 2017 WL 3427988, at *19 (S.D. Ga. Aug. 9, 2017) (denying summary judgment because if the plaintiff's version of events was correct, then the officer's "use of pepper spray was unnecessary, as [the p]laintiff was attempting to comply" with the officer's orders when the spray was used). Thus, summary judgment for Defendant Danio on this claim would be improper.

Support for that conclusion can be found in Eleventh Circuit precedent, most notably *Williams v. Rickman*, 759 F. App'x 849 (11th Cir. 2019). The plaintiff in *Williams* claimed a corrections officer used excessive force by administering pepper spray without a penological purpose. *Id*. at 852. The officer said that the pepper spray was necessary because the plaintiff was resisting commands—an allegation the plaintiff denied. *Id*. The district court granted summary judgment for the officer, crediting his statements and a use of force report over the plaintiff's allegations. *Id*. In reversing that decision, the Eleventh Circuit explained that the plaintiff "denied creating a disturbance" and, thus, there was "an issue of fact as to whether the use of pepper spray was

warranted." *Id*. According to *Williams*, the district court erred by accepting the officer's version of events over the plaintiff's version of events. *Id*. And the court stated that "[c]rediting [the plaintiff's] version of events at summary judgment, as we must, [the officer's] use of pepper spray was not penologically justified—because [the plaintiff] was not misbehaving." *Id*.

As in *Williams*, summary judgment would be improper on Plaintiff's claim that Defendant Danio used excessive force by spraying him with a chemical agent. *See also Jones v. Neve*, No. 5:21-cv-00312, 2023 WL 2195765, at *4 (N.D. Al. Jan. 24, 2023) (denying summary judgment on an excessive force claim when whether the inmate posed a threat before the chemical spray was administered was in dispute). Thus, the motion for summary judgment should be denied on this claim.

### 2. *Plaintiff's claim based on the takedown inside C-dormitory*

Defendants next argue that they are entitled to summary judgment on Plaintiff's claim that they used excessive force to take Plaintiff down to the ground inside of C-dormitory. The Court agrees with Defendants.

The fixed dormitory video shows what happened leading up to Plaintiff being taken to the ground. More specifically, it shows Plaintiff in an agitated state talking to several officers. Plaintiff then lunges at one of the officers and strikes him in the head area.[7] After Plaintiff struck the officer, he was grabbed and forcibly taken to the ground by Defendants. Defendants then struggled to subdue Plaintiff once he was on the ground. Contrary to Plaintiff's claim, the video does not show anybody kicking or beating him. Instead, it shows officers holding Plaintiff down while attempting to get him handcuffed and under control. The video shows that they eventually gained control of Plaintiff, lifted him up, and then escorted him out of the dormitory.

When evaluating an Eighth Amendment excessive force claim, courts are to consider the following factors: "(1) the need for the application of force; (2) the relationship between that need and the amount of force used; (3) the threat reasonably perceived by responsible

---

[7] Plaintiff has admitted that he "took one swing" at an officer. (Doc. 24 at 6). Although Plaintiff says he did so in self-defense, the video does not support that claim.

officials; and (4) any efforts made to temper the severity of the forceful response." *Ledlow*, 500 F. App'x at 912-13. From the consideration of such factors, "inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley*, 475 U.S. at 321.

Looking to the first factor, there was a need for Defendants to use force against Plaintiff. Plaintiff had just aggressively attacked an officer by striking the officer in the head area. Plaintiff was clearly agitated and posed a danger to Defendants and others. *See Williams v. Slack*, 438 F. App'x 848, 850-51 (11th Cir. 2011) (explaining that "prison guards may use force when necessary to restore order and need not wait until disturbances reach dangerous proportions before responding") (cleaned up); *see also Ledlow*, 500 F. App'x at 913 (finding that a corrections officer had a legitimate need to use force against an unrestrained inmate who was chasing after the officer).

32

As to the second factor, the need was closely related to the amount of force used.  Defendants reacted to Plaintiff's attack on the officer by grabbing his arms (the body parts he used in his attack) and taking him to the ground.  Once on the ground, Plaintiff continued to struggle.  He was eventually subdued and placed in restraints.  Contrary to Plaintiff's allegations, the video does not show Defendants kicking, beating, or otherwise gratuitously striking him.  *See McCroden v. Cnty. of Volusia*, 724 F. App'x 768, 771 (11th Cir. 2018) (stating that "we do not accept [the plaintiff's] version of the facts when [it is] obviously contradicted by the record," including video evidence).  Instead, the video shows Defendants grabbing Plaintiff by the arms, taking him to the ground, kneeling on his person to keep him on the ground, and then placing him in restraints.  That degree of force was closely related to the need to secure and restrain Plaintiff.  *See Burke v. Bowns*, 653 F. App'x 683, 698 (11th Cir. 2016) (finding that taking inmate to the ground and holding him down using an "arm bar" was reasonable force in response to the plaintiff spitting on a corrections officer).

33

Looking to the third factor, Plaintiff posed a serious threat to the safety of Defendants. He had struck one of them in the head area and was acting agitated. The video shows that Plaintiff's attack on the officer was not a defensive action—it was an aggressive action by Plaintiff. Thus, it was entirely reasonable for Defendants to believe that Plaintiff would cause additional harm if he was not quickly subdued. *See Williams*, 438 F. App'x at 851 (recognizing that courts give "great deference to prison officials acting to preserve discipline and security, especially when they make decisions at the scene of a disturbance"). Under the circumstances of this case, "there is no question that the officers had a significant need to bring Plaintiff under control." *See Burke*, 653 F. App'x at 696.

Finally, as to the efforts made to temper the severity of the forceful response, Defendants escorted Plaintiff to medical for an evaluation.[8] This fact "makes it less likely that [Defendants were] acting sadistically

---

[8] Plaintiff's pleading disputes the quality of the medical attention he received, but he has not brought a deliberate indifference claim against any prison medical provider.

34

instead of in good faith." *See Cockrell v. Sparks*, 510 F.3d 1307, 1312 (11th Cir. 2007); *see also Ledlow*, 500 F. App'x at 913 ("The immediate offer of medical assistance demonstrates an effort to temper the severity of the response."). Additionally, "the officers placed handcuffs and leg restraints on [Plaintiff] rather than using more forceful methods of restraint." *See Williams*, 438 F. App'x at 852.

When all the factors are considered together, they lead inescapably to the conclusion that the force was "applied in a good faith effort to maintain or restore discipline and not maliciously and sadistically to cause harm." *Id.* at 850 (cleaned up). Although Plaintiff's arm was apparently broken during the incident, that does not mean Defendants acted "maliciously and sadistically to cause harm." *See id.* For more on that, it is worth taking a look at the Eleventh Circuit's decision in *McCroden v. County of Volusia*, 724 F. App'x 768 (11th Cir. 2018). The plaintiff in that case was acting in an agitated and threatening manner. *Id.* at 771. In response, the defendants used an "arm-bar takedown" to subdue him. *Id.* at 769. As the plaintiff was taken to the ground, he broke his hip. *Id.* Rejecting the plaintiff's excessive force claim, the

*McCroden* court found that the "use of force was rationally related to a legitimate governmental objective." *Id*. at 771. According to the Eleventh Circuit, the extent of the plaintiff's injury was relevant but not dispositive because "acceptable levels of force may nonetheless cause injury." *Id*.; *see also Cockrell*, 510 F.3d at 1312 (finding no excessive force even though the plaintiff suffered broken bones from the use of force).

Here, as in *McCroden*, there is no evidence to support a conclusion that Defendants acted sadistically or maliciously to break Plaintiff's arm. Rather, they reacted to a dangerous and rapidly unfolding situation with a reasonable amount of force. The fact that the force used caused Plaintiff to suffer a broken bone does not make it excessive given the circumstances of this case.

Additionally, Plaintiff's claim that he sustained additional injuries while being held on the ground—such as Defendants allegedly bending his finger and toe, and Defendants punching his face, which caused a split lip—does not indicate Defendants' use of force was sadistic, malicious, or gratuitous. The video shows that it took multiple officers several seconds to get Plaintiff off of his feet and onto the ground because

36

Plaintiff was resisting.  The video does not show the officers using force gratuitously to harm Plaintiff—i.e., it does not show officers kicking, punching, or otherwise using unnecessary force.  *See Williams*, 438 F. App'x at 851 (disregarding the inmate's assertion that the defendants used excessive force by continuing to injure him after he was taken down when the assertion was contradicted by the defendants' evidence and when evidence showed the inmate was resisting by "bucking").

Having considered all the factors, no reasonable jury could find that Defendants used constitutionally excessive force when they took Plaintiff to the ground and subdued him immediately after he aggressively struck an officer in the head area.  Because the evidence in the record will not "support a reliable inference of wantonness in the infliction of pain . . . the case should not go to the jury."  *See Whitley*, 475 U.S. at 322. Defendants, therefore, are entitled to summary judgment on Plaintiff's Eighth Amendment claim involving the use of force inside of C-dormitory.

*3. Plaintiff's claim based on the takedown outside of C-dormitory*

Plaintiff also claims Defendants violated the Eighth Amendment by using excessive force when they initiated a takedown of Plaintiff outside

of C-dormitory.  Applying the factors set forth above, the video shows that Defendants did not use constitutionally excessive force when taking Plaintiff down to the ground.

With respect to the need for the application of force, the fixed entryway video shows Plaintiff being escorted out of the C-dormitory with an officer on either side of him.  This escort occurred shortly after the altercation discussed above inside of C-dormitory.  The video shows Plaintiff walking hunched over with his head down and his hands up by his neck.  Plaintiff appears to be resisting somewhat the officers' attempts to have him walk.  And Defendant Day's affidavit states that Plaintiff "refus[ed] to stand upright and . . . walk peacefully" while being escorted.  (Doc. 56 at 38).  Defendants then walked Plaintiff off the concrete and into the grass.  It was not until Plaintiff was fully in the grass, that Defendants took him to the ground.[9]  (*Id.*).  Plaintiff remains

---

[9] Plaintiff has alleged that Defendants "slammed" him "over hard onto his face on the concrete walkway and partial grassy area." (Doc. 24 at 9). The video clearly contradicts that claim.  Plaintiff was well into the grassy area when taken to the ground—the video does not show his face ever making contact with the concrete walkway.

down on the grass-covered ground for a brief time before he is lifted up. He then begins to walk normally and without resistance.

The force used in taking Plaintiff to the ground was also proportional to the need. Plaintiff's refusal to walk upright and submit to the officers posed a risk to the officer's "security interest in maintaining order" within the prison. *See Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir. 1990); *see also Scott v. Crosby*, No. 3:19cv4746, 2021 WL 667002, at *4 (N.D. Fla. Feb. 3, 2021) (determining force was necessary when the video evidence showed the handcuffed inmate physically resisting going into a confinement cell). The Eleventh Circuit has held that "use of a takedown is not disproportionate to the need to control an inmate who has failed to obey a jailer's orders." *Miles v. Jackson*, 757 F. App'x 828, 830 (11th Cir 2018). To the extent Plaintiff claims that the takedown constituted excessive force in light of Plaintiff's

broken arm, there is no evidence in the record showing that Defendants were aware at that time of Plaintiff's broken arm.[10]

Finally, as to the efforts made to temper the severity of the forceful response, Defendants initiated the takedown on the grass adjacent to the concrete sidewalk. They could have taken him down on the concrete, but instead they minimized the severity of the takedown by moving to the grassy area. Further, as set out above, Defendants escorted Plaintiff to a medical evaluation after he completed his decontamination shower, which "makes it less likely that [Defendants were] acting sadistically instead of in good faith." *See Cockrell*, 510 F.3d at 1312.

Having considered all the factors, when Defendants took Plaintiff down to the grass-covered ground outside of C-dormitory, they "applied [force] in good faith to maintain discipline" and not "to maliciously and sadistically" cause harm. *See Ledlow*, 500 F. App'x at 912. Because the evidence in the record will not "support a reliable inference of wantonness

---

[10] Indeed, Plaintiff says that he first realized his arm was broken while taking a decontamination shower—something that occurred after he was brought to the ground outside of C-dormitory. (Doc. 24 at 10).

in the infliction of pain . . . the case should not go to the jury." *Whitley*, 475 U.S. at 322.    Defendants, therefore, are entitled to summary judgment on Plaintiff's excessive force claim based on the takedown to the grass outside of C-dormitory.

### 4. *Plaintiff's gross negligence claim against Defendant Day*

Finally, Plaintiff asserts a state law gross negligence claim against Defendant Day for allegedly interfering with Plaintiff's initial medical examination.  (Doc. 24 at 16).  Defendants move for summary judgment on this claim, asserting Defendant Day did not display "deliberate indifference" against Plaintiff.   (Doc. 56 at 17).   Plaintiff has not responded to Defendant's assertion.

Generally, federal courts can exercise supplemental jurisdiction to decide state law claims that "are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy."  28 U.S.C. § 1367(a); *Rivas v. Bank of N.Y. Mellon*, 777 F. App'x 958, 965 (11th Cir. 2019).  Here, the Court has original jurisdiction over this case because Plaintiff has alleged a violation of federal law.  *See* 28 U.S.C. § 1331.

41

> In Florida, gross negligence requires a showing of:
>
> (1) the existence of a composite of circumstances which, together, constitute an imminent or clear and present danger amounting to more than the normal and usual peril; (2) a showing of chargeable knowledge or awareness of the imminent danger; and (3) an act of (sic) omission occurring in a manner which evinces a conscious disregard of the consequences.

*Deutsche Bank Nat'l Trust Co. v. Foxx*, 971 F. Supp. 2d 1106, 1117 (M.D. Fla. 2013); *see also Glaab v. Caudill*, 236 So. 2d 180, 185 (Fla. 2d DCA 1970) ("[G]ross negligence consists of a conscious and voluntary act or omission which is likely to result in grave injury when in the face of a clear and present danger of which the alleged tort-feasor is aware.").

Plaintiff alleges Defendant Day was grossly negligent in interfering with Plaintiff's post-use of force medical examination by "interrupt[ing]" and rushing the examining nurse. (Doc. 24 at 12). Even if Defendant Day interfered as Plaintiff alleged, no reasonable jury could find "the existence of a composite of circumstances which, together, constitute an imminent or clear and present danger amounting to more than the normal and usual peril." *See Deutsche Bank Nat'l Trust Co.*, 971 F. Supp. 2d at 1117. And that is an essential element of a gross negligence claim

42

under Florida law.  Thus, summary judgment should be granted for Defendant Day on Plaintiff's gross negligence claim.  *See Fred G. Wright, Inc. v. Edwards*, 642 So. 2d 808, 809 (Fla. 2d DCA 1994) (determining that summary judgment should have been granted on a gross negligence claim when there was no record evidence of conduct that rose to the level of gross negligence).

## IV.   Conclusion

For the reasons above, it is respectfully **RECOMMENDED** that:

1. Defendants' motion to dismiss for failure to exhaust administrative remedies (Doc. 56) be **GRANTED in part** as to the deliberate indifference claim against Defendant Lowe and **DENIED in part** as to the claims against the other Defendants.

2. Defendants' motion for summary judgment (Doc. 56) be:

   a. **DENIED in part** as to Plaintiff's Eighth Amendment excessive force claim involving Defendant Danio's use of chemical agent spray;

   b. **GRANTED in part** as to Plaintiff's Eighth Amendment excessive force claim against Defendants Day, Cook, Danio,

and Robinson for taking Plaintiff down inside and outside of the C-dormitory; and

    c. **GRANTED in part** as to Plaintiff's state law gross negligence claim against Defendant Day.

3. This matter be returned to the undersigned for further proceedings on the remaining claim that Defendant Danio used excessive force by spraying Plaintiff with a chemical agent.

At Pensacola, Florida this 22nd day of January 2024.

*/s/ Zachary C. Bolitho*

Zachary C. Bolitho
United States Magistrate Judge

## <u>Notice to the Parties</u>

Objections to these proposed findings and recommendations must be filed within fourteen days of the date of this Report and Recommendation. <u>Any different deadline that may appear on the electronic docket is for the Court's internal use only and does not control</u>. An objecting party must serve a copy of the objections on all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.